IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| DEBRA ANN MULLENAX, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:14-cv-00027 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By:    Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Debra Ann Mullenax asks this Court to review the Commissioner of Social

Security's ("Commissioner") final decision denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401–34, 1381–1383f. On appeal, Mullenax argues that the ALJ erred

in weighing her credibility and evaluating the opinions of her treating physicians. The case is

before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 17. Having considered

the administrative record, the parties' briefs and oral arguments, and the applicable law, I find

that substantial evidence supports the Commissioner's final decision, and it is therefore affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Mullenax filed for DIB and SSI on March 9, 2011. *See* Administrative Record ("R.") 10. She was 50 years old, R. 333, and had worked as a restaurant server, R. 359. Mullenax alleged disability because of a brain aneurysm, subarachnoid hemorrhage, high blood pressure, and fibromyalgia. R. 187. A state agency twice denied her applications. R. 10. Mullenax appeared with counsel before ALJ Brian Kilbane for an administrative hearing on December 6, 2012. R. 30–48. Mullenax testified about her medical conditions and the limitations those conditions caused in her daily life activities. R. 33–39. A vocational expert ("VE") also testified about Mullenax's work experience and her ability to return to her past work or to perform other work in the national or local economies. R. 39–46.

The ALJ denied Mullenax's application in a written decision dated January 18, 2013. R. 10–22. ALJ Kilbane first addressed Mullenax's prior applications and the prior decisions against her. R. 10. Mullenax previously filed claims for DIB and SSI on March 13, 2007, and April 30, 2009; these claims were rejected, respectively, by ALJ Charles Boyer on March 17, 2009, R. 117–27, and ALJ Mark O'Hara on January 28, 2011, R. 136–53. Both Mullenax's current claims and her prior claim filed in April 2009 alleged a disability onset date of February 19, 2007. R. 10. ALJ Kilbane found that ALJ O'Hara's determination that Mullenax was not disabled as of January 28, 2011, was determinative of the issue of her disability prior to that date, and he addressed only the period afterwards for her current applications. *Id.*

3

ALJ Kilbane found that Mullenax had severe impairments of a back disorder, fibromyalgia, status post 2005 myocardial infarction, and status post 2007 brain aneurysm and hemorrhage. R. 13–14. He determined that these impairments, alone or in combination, did not meet or equal a listing. R. 14–15. The ALJ next determined that Mullenax had the residual functional capacity ("RFC") to perform "light work" except that she "can only occasionally climb, balance, stoop, kneel, crouch, and crawl and he [sic] should avoid all exposure to hazards such as moving machine parts and unprotected heights."[1] R. 15. Relying on the VE's testimony, the ALJ concluded at step four that Mullenax could perform her past relevant work as a restaurant server. R. 33. Again relying on the VE's testimony, the ALJ alternatively found that Mullenax could perform other jobs available in the economy, including housekeeper, cafeteria attendant, and cashier. R. 20–21. He therefore determined that she was not disabled under the Act. R. 21. The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

## III. Discussion

Mullenax raises two arguments on appeal. First, she contends that ALJ Kilbane failed to provide specific reasons, supported by the record, for not fully crediting her statements concerning the extent of her limitations. Pl. Br. 5–10, ECF No. 18. Second, she contends that he incorrectly weighed opinions from two of her treating physicians by disregarding their entire

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

statements because a part of each concerned an issue reserved to the commissioner.[2] *Id.* at 10–12.

A.    *Relevant Medical Evidence*

On March 31, 2011, Mullenax saw Robert G. Kennedy, M.D., for a follow-up appointment concerning her "continued facial numbness, fibromyalgia, hypertension, and anxiety." R. 1921. She had diminished sensation and mild facial weakness on the left side of her face, but had increased movement of it. *Id.* Her back and shoulder displayed some tenderness, and she had some triggering in two fingers.[3] *Id.* She complained of pain between her shoulder blades, radiating into her neck, and pain in both hands, worse in the right hand. *Id.* She also reported increased difficulty with her mood and anxiety and stated that she might be having panic attacks. *Id.* Dr. Kennedy noted that she was in no real cardiopulmonary distress and found her pleasant, talkative, cooperative, and interactive. *Id.* He assessed facial numbness, fibromyalgia, hypertension, coronary artery disease status post myocardial infarction, and "anxiety now with marked panic." *Id.* He also opined that "[g]iven her difficulties with the

---

[2] Mullenax raises an additional argument concerning the VE's testimony. *See* Pl. Br. 9–10. At her administrative hearing, her counsel posed hypothetical questions asking the VE to determine whether a person with all of Mullenax's claimed symptoms would be able to work. *Id.*; R. 43–46. The VE testified that such a person was unemployable. R. 46. Mullenax argues that ALJ Kilbane erred by not considering this testimony in conjunction with her statements. Pl. Br. 10.

The ALJ's failure to consider hypotheticals based upon statements he determined were not credible cannot be error. Her counsel's hypotheticals included all of Mullenax's claimed symptoms. R. 43–46. The VE's evaluation of those hypotheticals is relevant only to the extent that the ALJ credits Mullenax's statements of her symptoms. Because he did not find Mullenax's statements fully creditable, he had no obligation to consider hypotheticals based upon all of her alleged symptoms. *Cf. Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) ("Because the ALJ's [RFC] determination is supported by substantial evidence and because the challenged hypothetical question merely incorporated that determination, the ALJ committed no error.").

[3] "Trigger finger, also known as stenosing tenosynovitis, is a condition in which one of your fingers gets stuck in a bent position." *Trigger Finger: Definition*, Mayo Clinic (Aug. 27, 2014), http://www.mayoclinic.org/diseases-conditions/trigger-finger/basics/definition/con-20043819.

neurologic symptoms as well as the fibromyalgia . . . it is unlikely that she will be able to return to work." *Id.*

On June 14, 2011, Mullenax had a rheumatology follow-up appointment with Matthew S. Hogenmiller, M.D. R. 2236. She reported tight, burning pain of 3 or 4 out of 5 in her shoulders and back. R. 2238. She walked with a normal gait and no assistive devices. *Id.* Dr. Hogenmiller recorded that she had severe fibromyalgia, cervical spondylosis, and recurrent tenosynovitis for which he did not know the cause. R. 2236. Mullenax declined treatment with a steroid pack because she did not like how they had made her feel, and Dr. Hogenmiller recommended Aleve. *Id.*

Mullenax returned to Dr. Kennedy on August 8 for a follow-up and evaluation of new chest pain. R. 2280. She reported constant left-side facial numbness; pain in her neck, upper back, and right foot; and aching in her elbows, knees, and ankles. *Id.* She rated her pain as a 3.5 out of 5. *Id.* She had increased her oxycodone use to four or five times per day. *Id.* She reported tightness in her chest and shortness of breath after walking half a block. *Id.* She also said that her hands and feet go numb and her memory was getting worse. *Id.* On examination, she had no cardiopulmonary distress, bilateral expiratory wheezes in her lungs, no tremor in her hands, some tenderness across her right big toe, and no swelling or erythema. *Id.* Dr. Kennedy assessed polyarthralgias, dyspnea related to smoking, and hypertension. *Id.*

On August 16, Mullenax had a follow-up appointment with Dr. Hogenmiller. R. 2235. She had mild difficulty with her wrist on extension and less swelling from her tenosynovitis than at her last visit. *Id.*

On August 24, Mullenax reported to cardiologist Masood Ahmed, M.D., per Dr. Kennedy's referral. R. 2269–71. She complained of worsening shortness of breath on exertion

and chest discomfort during anxiety attacks. R. 2269. She displayed no obvious orthopnea or ankle swelling and denied any syncope, presyncope, loss of consciousness, significant palpitation, or feelings of tachyarrhythmia or bradyarrhythmia. *Id.* On examination, Mullenax had no sounds in her lungs; no focal motor or sensory deficits; and no edema or joint deformity, swelling, or tenderness. R. 2270. An electrocardiogram ("ECG") returned normal findings. R. 2271. Dr. Ahmed assessed dypsnea with exertion, no known coronary artery blockage, hypertension dyslipidemia, a prior brain aneurysm, cervical joint degenerative disc disease, and fibromyalgia. *Id.* He ordered an echocardiogram and stress test and prescribed additional medication to address her blood pressure. *Id.*

On September 14, Mullenax returned to Dr. Ahmed. R. 2266–68. As part of the history of her present illness, Dr. Ahmed recorded that Mullanex was able to perform her daily activities without any limitation. R. 2266. On examination, there was no evidence of lower extremity edema or any joint deformity or swelling. R. 2267. The echocardiogram was essentially normal, showing no evidence of pulmonary hypertension, no valvular abnormality, and diastolic parameters within the normal range. *Id.* The stress test was negative for ischemic ECG changes and a myocardial perfusion imaging study showed no ischemia. *Id.* Dr. Ahmed concluded that Mullenax's chest discomfort was a symptom of her fibromyalgia and stressed that she needed to have better control over her blood pressure. R. 2267–68.

On October 28, Mullenax saw Dr. Kennedy for a follow-up of her previous symptoms and evaluation of abdominal pain. R. 2285. Mullenax reported nausea, trouble sleeping, and some panic attacks. *Id.* She complained of back pain when bending over and left leg pain with walking. *Id.* On examination, Dr. Kennedy found no issues with her lungs or heart, and he could not identify the cause of her diffuse abdominal pain. *Id.*

Mullenax visited the emergency department on December 1, 2011, after nearly falling down a set of stairs. R. 2378–79. She reported having balance problems since her aneurysm surgery in 2003 and complained of diffuse discomfort across her lumbar and upper thoracic spine. R. 2378. She denied head trauma, headache, visual disturbances, nausea, vomiting, speech disturbances, and upper or lower extremity weakness or paresthesias. *Id.* On physical examination, Mullenax displayed bilateral tenderness in her thoracic and lumbar paraspinous musculature, but had a negative straight leg raise test, no spasm, and full strength in her upper and lower extremities. R. 2379. Her heart and lungs were normal. *Id.* The attending physician prescribed Percocet and discharged her. *Id.*

On January 2, 2012, Mullenax had a follow-up appointment with Dr. Kennedy. R. 2380. She reported dull pain at an 8 out of 10 all over her back and increased wheezing. *Id.* She was on oxycodone, but had recently tested positive for THC on a drug test and entered a relapse program. *Id.* She was tolerating her hypertension medication without dizziness, chest pains, or palpitations. *Id.* On examination, she was in no cardiopulmonary distress, but her lungs had scattered rattling, and her extremities showed trace edema. *Id.*

On January 16, Mullenax had an X-ray taken of her thoracic spine. R. 2449. It revealed thoracic spondylosis and mild degenerative changes in the L5-S1 facet joints, but normal alignment, no vertebral compression, and no acute fracture. *Id.* A cranial CT scan the same day revealed bilateral encephalomalacia,[4] but no evidence of any acute intracranial abnormality. R. 2448.

---

[4] Encephalomalacia is "softening of the brain," often from a temporary loss of circulation. Dorland's Illustrated Medical Dictionary 621 (31st ed. 2007).

*B.*     *Credibility*

Mullenax argues that substantial evidence does not support the ALJ's credibility

determination and that he failed to provide specific reasons for his adverse credibility finding.

*See* Pl. Br. 5–7. The regulations set out a two-step process for evaluating a claimant's allegation

that she is disabled by symptoms, such as pain, caused by a medically determinable impairment.

*Fisher v. Barnhart,* 181 F. App'x 359, 363 (4th Cir.2006) (citing 20 C.F.R. § 404.1529). The

ALJ must first determine whether objective medical evidence[5] shows that the claimant has a

medically determinable impairment that could reasonably be expected to cause the kind and

degree of pain alleged. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Craig,* 76 F.3d at 594. If

the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the

claimant's pain to determine the extent to which it affects her physical or mental ability to work.

SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig,* 76 F.3d at 595.

The latter analysis often requires the ALJ to determine "the degree to which the

[claimant's] statements can be believed and accepted as true." SSR 96–7p, at *2, *4. The ALJ

cannot reject the claimant's subjective description of her pain "solely because the available

objective medical evidence does not substantiate" that description. 20 C.F.R. §§ 404.1529(c)(2),

416.929(c)(2). Rather, he must consider all the evidence in the record, including the claimant's

other statements, her treatment history, any medical-source statements, and the objective medical

evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must give specific reasons, supported

by specific relevant evidence in the record, for the weight assigned to the claimant's statements.

---

[5] Objective medical evidence is any "anatomical, physiological, or psychological abnormalities" that can be observed and medically evaluated apart from the claimant's statements and "anatomical, physiological, or psychological phenomena [that] can be shown by the use of medically acceptable diagnostic techniques." 20 C.F.R. §§ 404.1528(b)–(c), 416.928(b)–(c). "Symptoms" are the claimant's description of his or her impairment. *Id.* §§ 404.1528(a), 416.928(a).

9

*Eggleston v. Colvin,* No. 4:12cv43, 2013 WL 5348274, at *4 (W.D.Va. Sept. 23, 2013) (citing SSR 96–7p, at *4).

A reviewing court will defer to the ALJ's credibility finding except in those "exceptional" cases where the determination is unclear, unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all. *Bishop v. Comm'r of Soc. Sec.,* 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB,* 132 F.3d 1007, 1011 (4th Cir. 1997)); *see also Mascio v. Colvin,* 780 F.3d 632, 640 (4th Cir. 2015).

    1.    *Mullenax's Statements*

In the course of her applications, Mullenax twice completed forms describing how her conditions affect her ability to complete daily activities. *See* R. 412–19 (December 8, 2011), 428–35 (May 31, 2012). In the report dated December 8, 2011, Mullenax wrote that she does laundry and dusting around the house. R. 414. She prepares sandwiches, frozen dinners, and easy meals. *Id.* She has no difficulty handling her personal care, though she needs reminders to take her medications. R. 413–14. She does not do yard work because the equipment is too heavy and noisy. R. 414. She can handle a checkbook, but does not pay bills. R. 415. Her hobbies include reading, watching television, sewing, and card playing. She drives within her town, shops for groceries with her husband, talks on the phone daily, and attends church weekly when she feels well enough. R. 415–16. She can walk for "maybe 25 feet" before needing to rest for five minutes. R. 417. She noted difficulty with all postural movements and with concentration and comprehension skills. R. 417.

In the form dated May 31, 2012, Mullenax reported mildly decreased function compared to the first report five months prior. Mullenax wrote that she dusts what she can reach without bending. R. 430. She described her cooking as preparing simple meals, frozen dinners, soups,

sandwiches, and eggs. *Id.* She can still handle her personal care, though fastening buttons with her right hand and bending to tie her shoes is difficult. R. 429. She gets too confused to handle a checkbook or deal with money at all. R. 431. Her hobbies include "church," reading, watching television, and watching her husband's nephew's baseball games. R. 432. She has coffee with her sister-in-law two to three times a week, shops for groceries, and attends church and baseball games. R. 431–32. She can walk for a quarter block before needing to rest for five minutes. R. 433. She noted difficulty with the same tasks as before, but added memory, hearing, and seeing to the list. *Id.*

Mullenax also testified at the administrative hearing before ALJ Kilbane. R. 33–39. She said she has pain from her neck through her left leg and diffuse pain throughout her body. R. 33. The left side of her face feels numb and tingling cold. R. 34. Her right hand and arm get hot and swollen, causing her to drop things and to be unable to lift heavy objects. R. 35. She has balance issues and has fallen many times. *Id.* She has problems with comprehension and short term memory, and her medications make her tired. R. 36. She drives in a three-mile radius around her house and to the grocery store, but is uncomfortable on high-speed roads or longer drives. R. 37. She has anxiety attacks and depression and was hospitalized in June 2012 for attempted suicide. R. 38–39.

### 2. The ALJ's Findings

The ALJ determined that Mullenax had medically determinable impairments of fibromyalgia, a back disorder, status post a 2005 myocardial infarction, and status post 2007 brain aneurysm and hemorrhage. R. 13. He found that these impairments could reasonably be expected to cause some of Mullenax's alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely credible. R. 18.

He supported his finding with two reasons. First, her treatment records reflected generally unremarkable examination findings, conservative treatment, and no objective imagery or testing that supported the extent or intensity of her expressions of pain. *Id.* Second, Mullenax described activities of daily living "which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 19.

    *3.    Analysis*

Mullenax makes multiple arguments against the clarity and sufficiency of the reasons ALJ Kilbane gave for his credibility determination. *See* Pl. Br. 5–10. A number of these arguments are facially meritless. Mullenax states that the ALJ's opinion does not reference her administrative hearing testimony at any point. *Id.* at 7. On the contrary, the ALJ explicitly summarized her testimony, R. 15–16, and addressed its credibility, R. 18. Mullenax contends that the opinion fails to indicate which parts of Mullenax's statements the ALJ finds credible. Pl. Br. 6. The ALJ's RFC assessment, R. 15–20, implicitly demonstrates what functional limitations described by Mullenax the ALJ credited. The ALJ's partial crediting of Mullenax's statements as demonstrated by his RFC is adequate so long as his opinion demonstrates sufficient rationale for his determination.

Mullenax contends that the ALJ impermissibly "rel[ied] on his own medical opinion as to what could reasonably produce pain" when he stated that "'none of the imagery or testing evidence provides objective support for an impairment that could reasonably produce the extent or intensity of the claimant's expression of subjective pain.'" Pl. Br. 5 (quoting R. 18). Mullenax correctly asserts that the ALJ is required to evaluate the objective medical evidence as one of multiple factors when determining the degree to which a claimant's statements can be believed and accepted as true. SSR 96-7p, at *2. Had the ALJ considered nothing beyond the objective

evidence, he would have failed his obligation at step two of the credibility analysis to assess Mullenax's statements in light of the entire record. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). His review, however, was not confined to one factor. The ALJ correctly noted that the imaging studies showed "mild" findings, and he reasonably concluded that other testing was unremarkable. R. 18. On these grounds he questioned Mullenax's complaints of pain. ALJ Kilbane additionally considered Mullenax's other statements, her reported activities of daily living, the prior ALJ rulings, and medical-source opinions that interpreted the objective findings of record. R. 18–20. The ALJ did not impermissibly rely on his own medical opinion; he evaluated Mullenax's credibility step-by-step as required by regulation.

Mullenax also contends that the ALJ failed to provide specific reasons for his credibility determination. Pl. Br. 6. As noted above, the ALJ provided two specific reasons why he did not fully credit her statements: her medical records contain generally unremarkable examination findings, conservative treatment, and no objective imagery or testing that support the extent of her claimed symptoms; and her activities of daily living were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 18–19.

The record shows that Mullenax had some dyspnea related to smoking in August 2011, R. 2280, and some rattling in her lungs in January 2012, R. 2380. At other times, she had no sounds in her lungs, R. 2270, no abnormal findings on examination of her heart and lungs, R. 2285, 2379, no cardiopulmonary distress, R. 1921, 2280, 2380, and normal findings from an electrocardiogram, R. 2271, echocardiogram, R. 2267, and stress test, *id.* A comprehensive examination by a cardiologist concluded that any chest discomfort Mullenax was experiencing was caused by her fibromyalgia rather than any underlying cardiopulmonary issues. R. 2266–71.

13

Concerning her musculoskeletal pain, Mullenax at times displayed trace edema in her legs, R. 2380, tenderness in her back and neck, R. 1921, 2379, and finger triggering, R. 1921, 2236. More frequently, however, physical examinations of her back and extremities were unremarkable. *See* R. 2267 (no edema, joint deformity, or swelling); R. 2379 (negative straight leg raise test, no spasm, and full strength in upper and lower extremities); R. 2238 (walked with normal gait and no assistive devices); R. 2378 (denied upper or lower extremity weakness or paresthesias); R. 2280 (no swelling or erythma). An X-ray in January 2012 revealed only mild degenerative disc disease in Mullenax's thoracic and lumbar spine; she had no acute fracture, no vertebral compression, and normal alignment throughout her spine. R. 2449.

Mullenax displayed mild left-side facial numbness and weakness in March 2011, but reported increased movement of it at the same time. R. 1921. In later examinations, she displayed no focal motor or sensory deficit and grossly intact cranial nerves. R. 2267, 2270, 2379. A cranial CT scan in January 2012 revealed bilateral encephalomalacia, but no evidence of any acute intracranial abnormality. R. 2448. The ALJ reasonably found that this evidence did not support Mullenax's claims of disabling symptoms.

Another factor an ALJ must consider when evaluating a claimant's credibility is her course of treatment. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Throughout the relevant period, doctors treated Mullenax's conditions with only medication. They did not recommend surgery for any of her conditions, and the record does not show that Mullenax sought more aggressive treatments. While there is "no bright-line rule [for] what constitutes 'conservative' versus 'radical' treatment." *Gill v. Astrue*, 3:11cv85, 2012 WL 3600308, at *6 (E.D. Va. Aug. 21, 2012), a record of treatment through only medication supports the ALJ's label of Mullenax's treatment as conservative.

14

Concerning her reported daily activities, Mullenax told her doctor that she could perform

them without limitation in September 2011. R. 2266. Although this treatment note lacked

additional details, the daily activities Mullenax reported to the state agency, while not extensive,

support the ALJ's finding that her symptoms are not as severe as she claimed. Mullenax reported

dusting, reading, watching television, visiting with friends, attending baseball games, cooking

simple meals, driving short distances, and grocery shopping with her husband. R. 414–16, 430–

32. She can handle her personal care although she has some difficulty fastening buttons and tying

her shoes. R. 413, 429. The ALJ reasonably determined that activities such as these undermined

Mullenax's statements of complete disability. *See, e.g.*, *Gross v. Heckler*, 785 F.2d 1163, 1166

(4th Cir.1986) (finding that daily activities including washing dishes, grocery shopping, and

taking care of personal needs supported the ALJ's adverse credibility determination); *Hilton-

Williams v. Barnhart*, No. 7:05cv674, 2006 WL 3099648, at *4 (W.D. Va. Oct. 24, 2006) (noting

daily activities of cooking, cleaning, driving, grocery shopping, and watching television

supported the ALJ's adverse credibility determination).

The ALJ's credibility determination is entitled to deference from this Court. *See Bishop*,

583 F. App'x at 68. The ALJ provided specific reasons why he did not fully credit Mullenax's

statements on the severity of her symptoms, and substantial evidence supports his reasoning.

This record does not present an "exceptional" case where the ALJ's credibility determination

should be disturbed. *Id.*

C.     *Medical Opinions*

Mullenax next argues that the ALJ improperly rejected the opinions of two of her treating

physicians. Pl. Br. 10–12. "Medical opinions" are statements from "acceptable medical sources,"

such as physicians, that reflect judgments about the nature and severity of the claimant's

impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). They are distinct from medical-source opinions on issues reserved to the Commissioner, such as whether the claimant is disabled. 20 C.F.R. §§ 404.1527(d)(1), 404.1545(a), 416.927(d)(1), 416.945(a). The ALJ must consider these opinions as he would any relevant evidence, but he need not accord "any special significance" to the source's medical qualifications. *Id.* §§ 404.1527(d)(3), 416.927(d)(3); *see also Morgan v. Barnhart,* 142 F. App'x 716, 722 (4th Cir.2005) ("The ALJ is not free . . . simply to ignore a treating physician's legal conclusions, but must instead 'evaluate all the evidence in the case record to determine the extent to which [the conclusions are] supported by the record.'" (quoting SSR 96–5p, at *3)).

The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir.2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ finds that a treating-source medical opinion is not entitled to controlling weight, then he must weigh the opinion in light of certain factors including the source's medical specialty and familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record. *Burch v. Apfel,* 9 F. App'x 255, 259 (4th Cir.2001) (per curiam); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

16

The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin,* 734 F.3d 288, 295–96 (4th Cir.2013), and he must give "good reasons" for the weight assigned to any treating-source medical opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro,* 270 F.3d at 178 (the ALJ may reject a treating-source medical opinion "in the face of persuasive contrary evidence" only if he gives "specific and legitimate reasons" for doing so). His "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96–8p, at *5).

  *1.  Treating-Source Opinions*

  Mullenax kept a daily record of her symptoms for two months in October and November of 2011. *See* R. 2458–63. Her counsel supplied this record to Dr. Greene and Dr. Kennedy and asked each doctor to opine "as to whether or not her described symptoms are consistent with your clinical observations." R. 2458, 2472.

  Dr. Greene listed eleven dates when he saw Mullenax in 2012 and stated that Mullenax had chronic back pain and intermittent upper-extremity numbness. R. 2459. He concluded that Mullenax's anxiety and chronic pain and weakness preclude her from working, and he "highly" recommended permanent disability. *Id.*

  Dr. Kennedy wrote that he last saw Mullenax on January 2, 2012. R. 2473. He stated that her daily record of symptoms was "consistent with what [she] has been dealing with for over four years," including facial numbness and pain from fibromyalgia and cervical disc disease. *Id.* He stated that she had a panic disorder that impaired her stress tolerance. *Id.* Dr. Kennedy concluded that she had been unable to work for the past four years and that he supported her disability claim. *Id.* In a treatment note from March 2011, Dr. Kennedy also opined that "[g]iven

her difficulties with the neurologic symptoms as well as the fibromyalgia . . . it is unlikely that she will be able to return to work." R. 1921.

2.    *The ALJ's Findings*

The ALJ rejected Dr. Kennedy's opinion that Mullenax is unable to work because it was conclusory and concerned an issue reserved to the Commissioner. R. 19. He further found that Dr. Kennedy's opinion was "not supported by the longitudinal record with its relatively unremarkable physical findings and generally routine and conservative treatment, including his own treatment notes." *Id.* The ALJ commented that Dr. Kennedy's opinion appeared "to be based on the claimant's reported symptoms and limitations, rather than on objective findings and diagnostic test results." *Id.* The ALJ also rejected Dr. Greene's opinion, stating that it was conclusory and not accompanied by contemporaneous treatment notes with supporting objective findings. *Id.*

3.    *Analysis*

Mullanex concedes that both doctors' opinions contained statements on issues reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3). She argues, however, that the ALJ threw the baby out with the bathwater and failed to consider the parts of each opinion not addressing issues reserved to the Commissioner or to provide good reasons for rejecting these parts. Pl. Br. 10–12.

Dr. Kennedy's March 2011 opinion that "it is unlikely that [Mullenax] will be able to return to work," R. 1921, is an opinion of disability which is reserved to the Commissioner and not entitled to any special weight. 20 C.F.R. §§ 404.1527(d), 416.927(d). The same is true for the part of his November 2012 opinion where he stated Mullenax is unable to work and he supports her disability claim. R. 2473. The ALJ was only obligated to "'evaluate all the evidence in the

18

case record to determine the extent to which [these conclusions are] supported by the record.'" *Morgan*, 142 F. App'x at722 (quoting SSR 96–5p, at *3). Without this statement, Dr. Kennedy's November 2012 opinion still provides that the daily record of symptoms Mullenax kept was "consistent with what [she] has been dealing with for over four years," including facial numbness and pain from fibromyalgia and cervical disc disease and a panic disorder that impaired her stress tolerance. R. 2473. As an opinion from a treating-source physician, the ALJ can only reject it "in the face of persuasive contrary evidence," with "specific and legitimate reasons" for doing so. *Mastro*, 270 F.3d at 178.

The ALJ gave reasons for rejecting Dr. Kennedy's opinion besides the fact that it addressed reserved issues. He found that it was not supported by the generally unremarkable findings and conservative treatment in the record, including Dr. Kennedy's own treatment notes. R. 19. The ALJ previously described the relevant medical evidence, R. 15–18, and provided an analysis concluding that the longitudinal record was generally unremarkable, R. 18. Though the ALJ's statement was terse, it referenced previously provided facts and analysis that supplied persuasive contrary evidence to Dr. Kennedy's opinion. Additionally, the ALJ noted that Dr. Kennedy's opinion, written in response to a calendar of Mullenax's self-reported symptoms, "appears to be more based on the claimant's reported symptoms and limitations, rather than on objective findings and diagnostic test results." R. 19.

Pain is a subjective symptom, and Mullenax's subjective report of numbness is not confirmed by testing in the record; though Mullenax displayed mild left-side facial numbness and weakness in March 2011, she reported increased movement of it at the same time, R. 1921, and later examinations found no focal motor or sensory deficit and grossly intact cranial nerves, R. 2267, 2270, 2379. Furthermore, the ALJ found that Mullenax's anxiety was not severe and

that she had no limitations in social functioning or activities of daily living attributable to a mental impairment. These findings, which Mullenax has not contested, belie Dr. Kennedy's contention that a panic disorder "severely limits her stress tolerance." R. 2473.

An ALJ may give "significantly less weight" to a treating physician's "conclusory opinion based on the applicant's subjective reports." *Craig*, 76 F.3d at 590; *see* 20 C.F.R. §§ 404.1527(c)(3)–(4); 416.927(c)(3)–(4). I thus find no error in the ALJ's analysis of Dr. Kennedy's opinions. *See, e.g.*, *Bishop*, 583 F. App'x at 67 (substantial evidence supported ALJ's decision to reject treating physician's opinion "in its entirety" where the opinion mirrored Bishop's subjective complaints and was "inconsistent with the mild to moderate diagnostic findings, the conservative nature of Bishop's treatment, and the generally normal findings during physical examinations").

The ALJ provided less support for his rejection of Dr. Greene's opinion. Dr. Greene's statement that he highly recommends permanent disability, R. 2459, is an opinion on an issue reserved to the Commissioner and is thus not entitled to any special weight. Without this comment, Dr. Greene still opined that Mullenax is "unable to work without chronic pain or weakness" and that she has chronic back pain, intermittent numbness in her upper extremities, significant medical history and symptoms, and generalized anxiety that interferes with work. *Id.* The only reason the ALJ provides for rejecting this opinion is that "it is not accompanied by contemporaneous treatment notes with supporting objective findings on examination." R. 19. Though Dr. Greene listed eleven dates when he saw Mullenax in 2012, there are no treatment notes from these visits in the record. R. 2459. Nevertheless, after seeing Mullenax regularly for a year, Dr. Greene opined on Mullenax's condition as described above.

Without the treatment notes from these visits, it cannot be said that Dr. Greene's opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and thus entitled to controlling weight. *Mastro*, 270 F.3d at 178. Mullenax's journal of symptoms was a creative effort by her counsel, but it is not a substitute for a physician's treatment notes, which may contain not just a record of symptoms, but also the physician's impression of medical signs and a record of examinations, diagnoses, and treatment plans. I cannot fault the ALJ for questioning the opinion of a physician when the record contains no notes of his treatment. Even so, the ALJ failed to discuss the opinion's consistency with the record or provide specific reasons for dismissing the substance of this treating physician's opinion. Presuming this omission was error, it was nonetheless harmless.

Accepting everything that Dr. Greene wrote as true, he opined that Mullenax has pain, weakness, intermittent numbness, and anxiety that interfere with her ability to work. He did not opine on the extent of interference or the specific functional limitations caused by these symptoms, except to recommend that she receive disability. Dr. Greene's disability recommendation is entitled to no "special significance," 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3), and must be evaluated in light of all the evidence in the case record, *Morgan*, 142 F. App'x at 722. The ALJ's limited RFC determination of light work with additional postural limitations already acknowledges the intrusion of pain, weakness, and other issues upon Mullenax's ability to work, and it accounts for the other evidence of record indicating that she is less than completely disabled. Dr. Greene's non-specific limitations do not actually undermine the ALJ's RFC assessment. *Cf. Mascio*, 780 F.3d at 637 (holding that ALJ must explain conflicting assessments of specific functions). Furthermore, as demonstrated above, the other credible evidence does not support Dr. Greene's opinion that Mullenax is completely disabled.

Therefore, the ALJ's rejection of Dr. Greene's opinion, if error, was harmless. *Kersey v. Astrue*, 614 F. Supp. 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

### IV. Conclusion

This Court must affirm the Commissioner's final decision that Mullenax is not disabled if that decision is consistent with the law and supported by substantial evidence in the record. The Commissioner has met both requirements. Accordingly, the Court will **DENY** Mullenax's motion for summary judgment, ECF No. 18, and **GRANT** the Commissioner's motion for summary judgment, ECF No. 19. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: June 9, 2015

Joel C. Hoppe
United States Magistrate Judge